UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 19-10081-IT |
| IGOR DVORSKIY, | ) ) ) | |
| Defendant | ) ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM AND
MOTION FOR DOWNWARD DEPARTURE PURSUANT TO SECTION 5K1.1**

The government respectfully submits this sentencing memorandum and motion, pursuant to Section 5K1.1 of the United States Sentencing Guidelines, in connection with the sentencing of defendant Igor Dvorskiy.

Dvorskiy played an important role in the standardized test-cheating aspect of the college admissions scheme led by William "Rick" Singer. As the director of West Hollywood College Prep ("WHCP"), a small private high school in Los Angeles, Dvorskiy agreed to administer the SAT and ACT for Singer's clients at WHCP, and to allow co-conspirators (principally, Mark Riddell) to purport to "proctor" the exams and then correct the students' answers. In exchange, Singer's sham charity the Key Worldwide Foundation ("KWF") paid approximately $200,000 to a WHCP account controlled by Dvorskiy, and from which Dvorskiy was paid his salary.

Dvorskiy did not passively look the other way while cheating occurred at his school. Rather, he employed deception to further the scheme in several ways, including by (i) arranging for the testing locations for Singer's clients to be changed to WHCP specifically so the cheating could take place, (ii) falsely attesting that he would abide by the testing rules and policies of the testing agencies, (iii) working with Riddell and another proctor to facilitate the cheating (by, for

example, allowing Riddell to review and take pictures of the tests in advance), and (iv) concealing the cheating and mailing the testing materials to the testing agencies for scoring.

As explained below, the government submits that his conduct places Dvorskiy in the middle, in terms of culpability, of defendants who facilitated the test-cheating aspect of Singer's scheme. But unlike some test-cheating defendants who have been sentenced to probation, including both a facilitator and parents, Dvorskiy provided substantial assistance in the government's investigation and prosecution of other co-conspirators. Accordingly, and for the reasons further detailed below, the government recommends that Dvorskiy be sentenced to 1 year of supervised release, to include 3 months of home detention, and an agreed-upon forfeiture money judgment of $149,540, which represents the salary he was paid by WHCP during the pendency of his involvement in the scheme, and a $100 special assessment.

I.      **Overview of the Offense Conduct**

In late 2016, Dvorskiy met Singer, who was a college counselor for a WHCP student. PSR ¶ 44. At Singer's request, Dvorskiy changed the year of a class on the student's WHCP transcript in order to improve his college prospects. *Id.* Thereafter, Singer asked Dvorskiy to register WHCP as an SAT and ACT testing site, and to administer the standardized tests to Singer's students. *Id.* In exchange, Singer proposed that his sham charity KWF would make payments to WHCP. *Id.*

Dvorskiy agreed to Singer's proposal. In March 2017, WHCP received Singer's first payment, $25,000, for registering as an SAT testing site and administering the SAT to the son of defendant Marci Palatella. *Id.* ¶¶ 46-53. At the time, Dvorskiy did not have full insight into the scheme, such as understanding that proctor Mark Riddell had cheated for Singer's clients for years. *Id.* ¶ 52. But even at the initial stage of his involvement in the scheme, Dvorskiy facilitated and concealed the cheating, by, among other means, falsely certifying to the College Board that

Palatella's son took the exam over two days in accordance with his testing accommodations and concealing Riddell's role as the proctor from the testing agency. *Id.* ¶ 53.

Thereafter, Dvorskiy's knowledge of and involvement in the cheating grew, and he agreed to accept a $10,000 payment to WHCP for each test he administered fraudulently. *See id.* ¶¶ 54-113. Dvorskiy deceived the testing agencies and breached the fiduciary duties he owed them in multiple ways. For example, Dvorskiy made arrangements with Riddell to allow Riddell to arrive early at WHCP on several occasions so that Riddell could review the exams in advance and take pictures, simplifying his correction of students' answers after the exam. *Id.* ¶¶ 42, 67, 75, 80, 86. Further, Dvorskiy and Riddell discussed how Dvorskiy needed to conceal the cheating by certifying to the testing agencies that certain sections of the exams were administered on separate days (to maintain the façade pursuant to which the test had been moved to WHCP in the first place), even though all of Singer's students took the exam on one day. *Id.* ¶ 81. And Dvorskiy breached the fiduciary duties he owed ACT Inc. and the College Board (*id.* ¶ 35) by, among other things, falsely certifying that he administered the exams in accordance with their testing manuals (which prohibited and sought to prevent cheating in a number of ways, *id.* ¶¶ 45, 66), and hiding Riddell's role as the proctor. *Id.* ¶ 102.

For example, in March 2018, Dvorskiy agreed with Singer to allow Riddell to cheat on the SAT for two students—the son of defendants Amy and Gregory Colburn and the daughter of defendant Agustin Huneeus—in exchange for a $20,000 payment from KWF to WHCP. *Id.* ¶¶ 77-83. After Singer sent Dvorskiy the SAT admission tickets for the two students, Dvorskiy faxed letters to the College Board falsely stating that he would administer the exams in accordance with the students' multi-day testing accommodations, which was necessary to move the testing location to WHCP (where Dvorskiy would allow Riddell to secretly correct the students' answers). *Id.*

¶ 78. On March 9, 2018, Riddell flew from Florida to Los Angeles, and the following morning, he and Dvorskiy exchanged text messages to confirm that Riddell would arrive early at WHCP to review the exams. *Id.* ¶¶ 79-80. After the students completed the exams, which they took on a single day and which Riddell proctored, Riddell changed both students' answers to achieve inflated scores. *Id.* ¶ 80. Two days later, Riddell and Dvorskiy exchanged text messages to confirm that Dvorskiy had falsely reported to the College Board that the students had completed the first three sections of the SAT on the first day and the second two sections on the second day. *Id.* ¶ 81. Dvorskiy did so when returning the testing materials to the College Board, and he also concealed from the testing agency that Riddell had proctored (and cheated on) the exams. *Id.* ¶ 82. Four days after the test, KWF issued a $20,000 check payable to WHCP, c/o Igor Dvorskiy, which Dvorskiy deposited in WHCP's bank account. *Id.* ¶ 83.

In total, Dvorskiy facilitated cheating on approximately 20 exams for Singer's students at WHCP. *Id.* ¶ 42. In return, KWF paid WHCP $198,000, and Singer also paid $7,000 to a psychologist who evaluated Dvorskiy's own children for potential learning disabilities. That latter payment was a direct personal benefit to Dvorskiy. Together, the payments from KWF to WHCP and to the psychologist for Dvorskiy's personal benefit totaled approximately $205,000. *Id.* The money paid by KWF to WHCP was deposited into the school's general account, and from that account, the school paid its expenses, including Dvorskiy's salary.[1]

---

[1] In response to Dvorskiy's Objection No. 2 to the initial PSR, the final PSR states that "the Probation Office understands that the defendant personally received the money from [the] payments" to WHCP. *See* PSR, Resp. to Def. Obj. No. 2. This is not the government's understanding. Rather, as outlined in Dvorskiy's objection, the checks from KWF to WHCP were deposited into WHCP's bank account, from which Dvorskiy drew his salary and from which other expenses were paid.

II.     **The Applicable Sentencing Guidelines**

The parties have stipulated in the plea agreement that Dvorskiy's total offense level under the Sentencing Guidelines is 17. The resulting Guidelines sentencing range is between 24 and 30 months. Probation has taken the position, which the government acknowledges the Court has adopted in related cases, that there was no gain or loss to the testing agencies, and thus Dvorskiy's total offense level is 16 (based on a default base offense level of 19 for racketeering conspiracy), which results in a Guidelines sentencing range of 21 to 27 months.

III.    **Sentencing Recommendation and Motion Pursuant to Section 5K1.1**

Regardless of whether the Court adopts the Guidelines range stipulated to by the parties or set forth in the PSR, the government submits that a downward departure, pursuant to Section 5K1.1 of the Guidelines, is appropriate to reflect Dvorskiy's substantial assistance in the government's investigation, and a further downward variance is appropriate to avoid unwarranted sentencing disparities and account for other § 3553(a) factors, as set forth below.

Dvorskiy provided substantial assistance in the government's investigation and prosecution of several parents involved in the test-cheating aspect of Singer's scheme. Unlike several other cooperating defendants (*e.g.*, Mark Riddell, Laura Janke, Steven Masera), Dvorskiy did not agree to cooperate promptly after his arrest in March 2019. He first proffered with the government approximately six months later, in September 2019. At that time, he provided detailed information (as well as corroborating text messages) about the general operation of the test-cheating scheme at WHCP and his role therein, as well as specific instances of cheating and the parents involved. Further, Dvorskiy provided important evidence in that he acknowledged owing the College Board and ACT Inc. fiduciary duties, and that he breached those duties by, among other things, lying to the testing agencies and accepting money to facilitate the cheating. Dvorskiy

proffered again in 2019, and he then made himself available to prepare for trial testimony, which was obviated by the guilty plea of Palatella shortly before her September 2021 trial and the guilty pleas of the Colburns and defendant I-Hsin "Joey" Chen shortly before their January 2022 trial. Dvorskiy's cooperation was less immediate, extensive, and valuable than that of defendants like Riddell (who cooperated against Dvorskiy) and other defendants whom the Court has recently sentenced (*e.g.*, Laura Janke, who immediately accepted responsibility for her actions, provided extensive information about numerous parent and coach defendants, and ultimately testified at two trials). But Dvorskiy's cooperation was more valuable than that of a defendant like Martin Fox, who (in addition to being significantly more culpable than Dvorskiy, as explained below) proffered only once, provided valuable information about only one defendant (Williams), and began to cooperate at about the same time as Dvorskiy.

The government respectfully submits that Dvorskiy's crime calls for a meaningful sentence, one that should impose punitive effects not in the form of incarceration, but home detention. Dvorskiy played an important role in the success of the test-cheating aspect of Singer's scheme and facilitated cheating on approximately 20 exams over multiple years. While Dvorskiy did not himself change the students' answers or personally pocket the payments from KWF, he did far more than simply look the other way while his school became the hub for one of the most extensive and elaborate standardized test-cheating schemes in U.S. history. Rather, he employed deception in numerous ways, and his active participation in the scheme grew as he became more familiar with Singer's operation and Riddell's preferences.

The sentences imposed on related defendants involved in the test-cheating aspect of the scheme have informed the government's recommendation. The sentences range from probation (*e.g.*, Houston testing-site administrator Williams, and parent Peter Jan Sartorio) to 7 months

incarceration (parent Elizabeth Henriquez, who engaged in cheating on 5 separate exams and also participated in the side door aspect of the scheme), with the average sentence being approximately 2.5 months.[2]

And more specifically, the facilitators who have been sentenced for their roles in the test-cheating aspect of the scheme thus far, and their culpability relative to Dvorskiy, are informative.

- ***Riddell***. Riddell is significantly more culpable than Dvorskiy. He participated in the scheme for nearly a decade, cheating on 27 exams for Singer's clients in exchange for nearly $250,000 in bribe payments to his pocket. He cheated on the exams in numerous ways (ranging from changing students' answers at WHCP and other Singer-controlled testing sites, to using a fake ID and posing as a student to take an exam). Riddell also advised others (like Dvorskiy) on how to avoid detection of the cheating. Nevertheless, as noted above, Riddell's cooperation was more extensive than Dvorskiy's. Riddell was sentenced to 4 months in prison.

- ***Fox***. Fox is significantly more culpable than Dvorskiy. Fox facilitated both the test-cheating and side-door aspects of the scheme by serving as a middleman between Singer and Williams and between Singer and college coaches. Fox profited approximately $245,000 from the scheme, and unlike Dvorskiy, Fox was also facilitating bribe payments totaling thousands of dollars more, as well as recruiting others to join the scheme (like Williams). The sentence imposed by this Court, 3 months of incarceration followed by 3 months of home detention, reflects credit for his cooperation against Williams and also accounted for Fox's significant health concerns requiring incarceration at a federal medical center.

- ***Williams***. Dvorskiy is more culpable than Williams, who was a public-school employee who was a low-level player in the scheme and received significantly less money than WHCP did for her role in allowing Riddell to purport to proctor approximately five exams at the Houston test center while helping students cheat. Nevertheless, the government notes that Williams had more insight into the details of the scheme at the beginning of her involvement (having been recruited by Fox) than Dvorskiy did, and in one instance, she even delivered an exam to Riddell's hotel room for him to take instead of the student. Unlike Dvorskiy, Williams did not cooperate in the government's investigation. The Court sentenced Williams to 12 months of probation. While Dvorskiy is more culpable than Williams (though perhaps not as much as the difference between 20 exams and 5 exams may suggest),

---

[2] That average sentence drops to about one month of imprisonment when the pool is narrowed to those who participated in only the test-cheating aspect of the scheme and sentences imposed on parents who participated in both the test-cheating and athletic recruitment aspects of the scheme are removed.

it is difficult to justify a sentence of incarceration for him in light of Williams' probationary sentence without any home confinement.

The government's recommendation of 3 months home confinement here balances these competing factors by taking into account the seriousness of Dvorskiy's crimes and the sentences imposed on other defendants, while also crediting him for his cooperation. The government's recommendation also accounts for the collateral consequences that a term of incarceration would impose on Dvorskiy's elderly parents, for whom he is the sole caregiver. PSR ¶¶ 150-51.

## IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court sentence the defendant to 1 year of supervised release, to include 3 months of home detention, a forfeiture money judgment of $149,540, and a $100 special assessment.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Ian J. Stearns*
STEPHEN E. FRANK
LESLIE A. WRIGHT
KRISTEN A. KEARNEY
IAN J. STEARNS
Assistant United States Attorneys

Date: August 2, 2022

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

By: */s/ Ian J. Stearns*
IAN J. STEARNS
Assistant United States Attorney