UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 19-cr-10081-IT |
| | ) | |
| v. | ) | Leave to File Partially Under Seal |
| | ) | Granted on August 2, 2022 |
| IGOR DVORSKIY | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT IGOR DVORSKIY'S SENTENCING MEMORANDUM**

**I.    Introduction**

Igor Dvorskiy, a 55-year old asylee from Ukraine, with no criminal history, is before this Court for sentencing on one count of racketeering conspiracy. The parties agree that a prison sentence is unnecessary to meet the objectives of 18 U.S.C. § 3553(a), though the government is asking this Court to impose a sentence that includes three months of home confinement. Mr. Dvorskiy respectfully submits that a sentence of time served followed by one year of supervised release is appropriate.

Like many of the defendants in this case, until he met Rick Singer, Igor had lived a law-abiding life defined by hard work, contributing to his community, and devotion to his family. As set forth herein, Igor feels deep remorse for his involvement in the offense conduct and the impact that it has had on his family, community, and the college admissions system. He takes full responsibility for his participation and he accepts the consequences of his guilty plea.

There are three notable facts about Igor that, taken together, set him apart from most, if not all, of the dozens of defendants charged in the "varsity blues" cases. *First*, Igor does not hold a position of wealth, privilege, or power. He did not attend or work at an elite university, he is

1

not a sophisticated businessman, and he is not politically connected. Igor was born into relatively humble means in Kiev, Ukraine (then part of the Soviet Union) and throughout his childhood and young adulthood was discriminated against because he and his family are Jewish. Igor later fled to the United States where, through extraordinary hard work and perseverance, he managed to create a loving family unit, a network of caring friends, and, with West Hollywood College Preparatory School (WHCP), a special and unique educational community. Throughout it all, Igor has given much of himself to others while living a modest life. *Second*, Igor's actions were not motivated by a desire to personally enrich himself or to obtain status or prestige for himself or his family members. He deposited every single check that he received from Rick Singer's Key Worldwide Foundation (KWF) into the WHCP's bank account where it was used for the normal operating expenses of the school that Igor was so devoted to. *Third*, Igor quickly accepted responsibility for his conduct, demonstrated his sincere remorse, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Other defendants pleaded guilty well after Igor, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, but have long-since been sentenced and moved on with their lives. Igor, in contrast, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.

## II.   Factual Background

### A.  Igor Dvorskiy's Personal Background and Character

Igor was born in Kiev, Ukraine in 1966.[1] The only child of Emmanuil Dvorksiy and Elina Dvorskaya, Igor grew up in the former Soviet Union with his basic needs provided for. However, he and his family experienced significant anti-Semitism including, for Igor, physical assaults and other forms of discrimination that prevented him from reaching his full potential in

---

[1] The facts set forth herein are from the Pre-Sentence Investigation Report or, where noted, from the attached letters in support which have been filed as Exhibits.

school and work. Igor married Olga Lozutskaya in 1993 and the following year the couple, along with Igor's parents, fled to the United States where they sought, and were eventually granted, asylum from religious persecution. Igor, his parents, and Olga are now all naturalized United States citizens.

Igor and Olga have three college-aged children: ███████████████. Although Igor and Olga are currently living separately (mainly because Igor is residing with and taking care of his elderly parents), Olga relays that Igor is a caring, helpful, and understanding husband who has a close relationship with her and their children. These qualities are echoed in many of the letters from Igor's friends, who observe Igor's wonderful relationship with his family (his children are often described as kind and good-natured) and his exceptional efforts to help others. *See* Ex. A (Letters from family friends).

Igor is a devoted son and caretaker. His mother, Elina, is almost 82, and in the last several years has had increasingly debilitating hand tremors which have made it nearly impossible for her to feed herself and perform other daily activities without help. Emmanuil, Igor's father, is 84, and had been taking care of Elina until two recent stomach surgeries which have significantly debilitated him and required around the clock care. Igor has become the primary caregiver for both of his parents, driving them to medical appointments, buying groceries, and taking care of other needed tasks.

Caregiving comes naturally to Igor. Though trained as an electrical engineer in Ukraine, after arriving in the United States Igor first worked as a home health aide. Three individuals who worked with Igor at this time have submitted letters on his behalf. The letters are notable because, more than 25 years later, they each recall how Igor brought a special kindness, positive attitude, and compassionate demeanor to the often challenging work that home health aides

3

perform. *See* Ex. B (Letters related to Igor's early work in the United States.) In the late 1990s and early 2000s Igor worked as a software engineer; former colleagues from this time similarly describe how impressed they were with Igor both professionally and personally. *Id*.

Around 2001 Igor joined his mother Elina at WHCP, the school she founded. As the letters submitted by teachers, staff, parents, and students attest, Igor became nothing less than the heart and soul of WHCP. *See* Ex. C (Letters from WHCP teachers and staff) and Ex. D (Letters from WHCP parents and students). No task was too small for Igor to perform, no problem too challenging for him to solve. He helped students with their academic, social, and emotional challenges. He helped staff and parents through financial difficulty and sickness. The WHCP teachers and staff write that Igor was trustworthy and fair. The WHCP parents observe that he genuinely cared for their children and worked hard to foster a school environment that had a strong curriculum but was also, importantly, a supportive and close-knit community. *Id*. The letters are remarkable because, written by diverse individuals who have in many cases known Igor for decades, they uniformly describe Igor as an exceptionally caring and supportive boss and a beloved school Director who consistently went above and beyond for his school community.

And as several letters reflect, Igor's generous spirit extends well beyond WHCP. As a particularly timely and poignant example, since the Russian invasion of Ukraine earlier this year, Igor has been assisting Ukranians fleeing war and seeking refuge in the United States. He has helped Ukranian refugees navigate complicated paperwork, he has organized logistics (literally picking up a refugee at the border), he has provided a warm welcome into the Los Angeles Ukranian community, and he has spearheaded fundraising efforts. *See* Ex. E (Letters discussing Igor's efforts).

### B. Igor Dvorskiy's Involvement in the Offense Conduct

Igor is a trusting person whose main goal in life has been to care for his family and find opportunities to improve WHCP. That made him an ideal target for Rick Singer. When Singer initially reached out to Igor, it was about one of Igor's students that Singer was helping. Singer quickly pivoted the conversation to ways that KWF, which he described as a non-profit organization that helped underserved kids, and WHCP, could collaborate. Singer came across as successful and impressive and Igor was taken with his confident demeanor and interest in Igor's small school. Ex. F (Letter from Igor Dvorskiy).

Against that backdrop, when Singer first asked Igor about using WHCP as a testing site, Igor believed that it was a perfectly legitimate and appropriate request. Igor did not know, yet, that Mark Riddell would be changing students' answers or that Igor would be told to falsely certify test information. Igor believed that the $25,000 that Singer offered was justified because Igor was registering WHCP as a testing site, opening the school campus over a weekend, working as a test administrator, and performing related tasks. He also believed that KWF was a successful non-profit that helped kids in need – a belief he continued to hold throughout his involvement with Singer. In short, Igor viewed the arrangement as him providing a useful space and service to a worthy organization in exchange for a fee that he thought was likely commensurate with other organizations that offer their facilities for college admissions testing. *Id.*

The first time that Singer sent a student to WHCP to take an exam, Igor opened the school, dutifully checked the student's identification against the test (something he continued to do for every test), and thought that Mark Riddell was present as a legitimate proctor. When the

exam concluded and Riddell and Singer instructed Igor to list his own name as the exam proctor (not Riddell's) and to falsely claim that the exam was taken over two days (not one), Igor did not fully understand why he was being asked to make false statements, but he went along with it.

Before the second set of tests, Singer asked Igor if he would accept a lower administrative fee because, Singer claimed, it was for a needy child who Singer was going to pay for himself. Igor, still unaware of the scheme and under the impression that he was assisting under-served children, told Singer that he would love to help. Igor then oversaw another exam where the only irregularity was that Igor was told to write his own name as the proctor, which he again did.

It was during the next set of exams that Igor began to realize that Riddell was changing the students' exam answers and that Igor's own act of submitting incorrect information to the testing agencies was complicit. Rather than say anything, or stop, to his shame and regret, Igor continued working as a test administrator, allowing Riddell to change answers, and submitting false information to the College Board and the ACT. In total, Igor administrated tests over 11 days often with several students each day. He knew that Riddell was changing answers on the exams and he knowingly, and repeatedly, submitted false information to the College Board and the ACT. Igor deposited $198,000 in payments from KWF into the WHCP bank account.

Igor takes complete responsibility for his conduct that has resulted in his criminal conviction. He knows that he should not have allowed cheating or participated in submitting false information to the College Board or ACT. Igor recognizes that he comforted himself in his mistaken belief that he was also helping WHCP, the school and community that he loves so

much. As he writes in his letter to the Court, Igor now realizes that he hurt the very community that he was trying to help. He also recognizes the impact that his actions have had on the college admissions system more broadly, and sincerely regrets his involvement. Ex. E.

At the same time, it is notable that Igor deposited all of the checks he received – those that he received *before* he was aware of the scheme as well as those he received once he was an active participant – into the WHCP bank account. In other words, Igor's purpose in working with Rick Singer was not to personally enrich himself. It is also relevant that Igor was unaware that the money from Singer had originated with the parents of the children exam-takers, or even that the exam-takers were the children of wealthy individuals. Igor had few communications with Riddell outside of arranging logistics at Riddell's request and exchanging test-day niceties, and his interactions with Singer were comparatively business-like. Igor viewed Singer's organization as a successful non-profit and believed that Singer was providing varied services, including testing accommodations (and testing assistance via Riddell) for needy students, at WHCP.

### III. The Sentencing Guidelines and Section 3553(a) Factors

In sentencing Igor, the Court must arrive at a sentence sufficient, but not greater than necessary, to achieve the goals of sentencing. *See* 18 U.S.C. § 3553(a). The Supreme Court has stressed that this principle – not the Guidelines – is the most important overall factor in the Court's sentencing decision. *Kimbrough v. United States*, 552 U.S. 85, 109-111 (2007). While "the Guidelines should be the starting point and the initial benchmark," the district court "must then consider the arguments of the parties and the factors set forth in 3553(a)." *Peugh v. United States*, 569 U.S. 530, 536 (2013) (internal quotation marks omitted). "The district court may not presume that the guideline range is reasonable." *Id.* (internal quotation marks omitted); *see also Rita v. United States*, 551 U.S. 338, 351-52 (2007).

### A. The Guidelines

On November 13, 2019, Igor pleaded guilty to a violation of 18 U.S.C. § 1962(d), racketeering conspiracy. The plea agreement reflects the parties' agreement to the following Guidelines calculation:

Base Offense Level:    8 (U.S.S.G. §§ 2E1.1(a)(2), 2(B)(4))

Loss over $150,000:    10 (U.S.S.G. §§ 2B4.1(b)(1)(B), 2B1.1(b)(1)(F))

Abuse Posit. Trust:    2 (U.S.S.G. §3B1.3)

Acceptance Resp.:    -3 (U.S.S.G. § 3E1.1)

Total Offense Level:    17

Probation has calculated the Guidelines differently, concluding that the total offense level is 16.  The difference is based on the Court's previous determination that there was no foreseeable pecuniary harm to the testing agencies or universities, and that since there was no financial loss, gain cannot be used as an alternative measure of loss. Accordingly Probation notes that a calculation under U.S.S.G. § 2B1.1 would result in an adjusted offense level of 6 (after applying U.S.S.G. § 2B1.1(a)(2)). Since the default racketeering offense level is greater than 6 for the underlying offenses, Probation applies a base offense level of 19 with 3 points off for acceptance of responsibility, resulting in a total offense level of 16.

Because Igor has no prior convictions, he is in criminal history category I. The resulting guidelines range is 24-30 months (based on the parties' plea agreement) or 21-27 months (based on Probation's calculation).

/ / /

/ / /

## B. Overview of the Relevant Section 3553(a) Factors

*The nature and circumstances of the offense and the history and characteristics of the defendant.*

As set forth above, Igor was gradually pulled in to the offense conduct – first as an unknowing test administrator and then as a willing, though subservient, participant. To be sure, once Igor became aware that Riddell was changing exam answers he allowed and facilitated the cheating. Igor also knowingly submitted false information to the College Board and the ACT and accepted payment in exchange for the use of the WHCP campus and his own, improper, services. But in mitigation, Igor believed KWF was a legitimate organization that assisted low income children and he never understood the full scope of Singer's scheme. Nor did Igor act out of a desire to personally profit from his involvement with Singer; rather, he was motivated by the opportunity to bring needed funds to WHCP.

The 49 letters submitted on Igor's behalf speak to his life history and personal characteristics. Although Igor met the letter writers at different stages of his life and through varied experiences, some common themes emerge. First, most of the individuals who have submitted letters are people who have had long-term relationships with Igor, often spanning decades. It is reflective of that fact that Igor has created meaningful and lasting connections with the people in his life. Second, the letters consistently describe that Igor is a giver. He gives of his time, his expertise, and his money. He gives in small ways and big. But what is clear is that Igor is someone that people turn to in times of need, and he is unwaveringly there for them. Third, with WHCP, Igor and Elina have created a special school that fosters not only education but also, community. The school, through its teachers and staff (including Igor) has touched many lives in its more than 20 years of existence and it continues to be a unique learning environment. Last,

Igor values family. He and Olga have been married for 28 years and have raised three well-adjusted, kind, well-liked children. Igor cares deeply for his elderly parents and is their main source of assistance. These are qualities that Igor's friends, co-workers, and community observe to be paramount to Igor.

*The need for the sentence to promote respect for the law.*

The instant offense is an aberration from Igor's otherwise law-abiding life and Igor has readily demonstrated his respect for the law through his prompt acceptance of responsibility. Igor is dedicated to remediating the harm stemming from his actions. He not only took responsibility for his conduct early, he also ███████████████████████.[2] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████. The PSR notes that in the three and a half years since his arrest, Igor has complied with all Court-ordered conditions of release.

*The need for the sentence to afford adequate deterrence to criminal conduct.*

There is no need for a sentence of incarceration, or even house arrest, to deter Igor from future criminal conduct. The offense conduct was an aberration in an otherwise law-abiding life. The offense was committed under a unique set of circumstances that are unlikely to ever arise again. Given Igor's relative culpability, a sentence of time served with a year of supervised release is sufficient to promote general deterrence.

---

[2] The first few defendants who pleaded guilty in this case did so shortly after being charged and, for some, before reviewing discovery. Given the novel nature of the charges and counsel's ethical duty to fully and appropriately advise her client, Igor heeded a slightly more conservative approach, waiting until after he and his counsel had an opportunity to review the discovery. ███████████████████████████████████████████████████████████

/ / /

*The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.*

The conduct of the other test administrator in this case, defendant Niki Williams, is most similar to Igor. Both Igor and Williams allowed Riddell to change students' answers on exams, and both submitted false information to the College Board and ACT. At first glance, Igor's conduct is more egregious because he presided over more test days (eleven[3] compared to Williams' five) more students (sixteen compared to Williams' five), and received more money ($198,000 to WHCP and ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ compared to Williams' $12,500). However, a few differences are worth mentioning.

To begin with, Williams knew more about the overall scheme than Igor and she participated in it for a longer time period. In addition, given that Igor did not keep the money from Singer for himself ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, the personal benefit to both individuals was roughly the same, though Igor, of course, also sought to benefit WHCP. And although Igor acknowledges that he engaged in fraudulent conduct, he simultaneously viewed himself as performing a service. In that vein, he checked every students' identification badges against their exams and made efforts to create an environment conducive to test taking. In contrast, Williams allowed Riddell to take an exam to his hotel room and complete the exam without the student ever showing up.

Also relevant is the fact that Igor accepted responsibility a year before Williams ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Williams pleaded guilty after months of litigation, ▇▇▇▇

---

[3] This includes the first several tests during which Igor was unaware of the cheating on the exams.

███████████, and she was sentenced to one year of probation in December 2020. Her case has long since been resolved as Igor has waited, patiently, for his day before the Court.

IV.     Conclusion

Igor's actions that led to his conviction are an aberration from a life otherwise dedicated to hard work, caring for his family, and devotion to the community, particularly, WHCP. He has demonstrated his sincere remorse through his speedy acceptance of responsibility and ████ ████████████████████████████████████. Igor respectfully requests that he be sentenced to time served and one year of supervised release.

Dated: August 2, 2022                        Respectfully submitted,

                                             IGOR DVORSKIY,
                                             By his attorney,

                                             /s/ Melissa A. Weinberger
                                             Melissa A. Weinberger
                                             Touchton & Weinberger LLP
                                             800 Wilshire Blvd., Suite 1050
                                             Los Angeles, CA 90017
                                             Phone: (213) 867-6350
                                             Fax: (213) 673-1386
                                             Email: melissa@twcounsel.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed electronically on August 2, 2022 and delivered by electronic means to counsel for the government.

                                             /s/ Melissa A. Weinberger
                                             Melissa A. Weinberger